# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>               **Plaintiff,**<br><br>  vs.<br><br>**TUT YUAL,**<br><br>               **Defendant.** | **8:23CR09**<br><br>**FINDINGS AND RECOMMENDATION** |

      This matter comes before the Court on the Motion to Suppress Evidence (Filing No. 53) filed by Defendant, Tut Yual. Defendant seeks a court order suppressing all physical evidence seized from his vehicle during a warrantless search, and all statements he made to law enforcement after he stated he was "done talking." Defendant filed a brief (Filing No. 54) in support of the motion and the Government filed a brief in opposition (Filing No. 69).

      The Court held a pre-hearing status conference with counsel on October 30, 2023, and held an evidentiary hearing on the motion on March 12, 2024. Defendant was present at the evidentiary hearing proceedings with his attorney, Assistant Federal Public Defender, Kelly M. Steenbock. The Government was represented by United States Attorney, Susan T. Lehr. The Court received into evidence, without objection, the Government's Exhibit 1 (Recording of Defendant's arrest) and Exhibit 2 (Recording of Defendant's DEA interview), without objection. Christian Iten, a special agent with the Drug Enforcement Administration ("Special Agent Iten") and Nicholas Jaworski, an investigator with the Nebraska State Patrol ("Investigator Jaworski") testified at the hearing. A transcript (TR.) of the hearing was prepared and filed on April 11, 2024. (Filing No. 107). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge will recommend that the motion be denied.

## BACKGROUND

      On December 5, 2022, Investigator Jaworski and Special Agent Iten were working with Commercial Interdiction Unit Task Force Group 2, a group of law enforcement officers that work

buses, trains, airports, and package sorting facilities to find and interdict narcotics traffickers.[1] On that date, the unit searched a package at the Omaha airport pursuant to a search warrant, finding approximately two and a half thousand M30 pills containing fentanyl inside the package. The package was addressed to a "Deng Taath" at 10840 Cottonwood Lane, Omaha, Nebraska. Law enforcement's search of public records did not locate an individual by that name at that address. The unit arranged for a controlled delivery of the package at the apartment complex to which it was addressed. (TR. 12-13, 39).

On December 6, 2022, the unit took the package to the apartment manager's office for its recipient to pick it up. Surveilling officers observed an individual identified as Moses Gony pick up the package. Mr. Gony was talking on his cell phone as he picked up the package. Law enforcement arrested and interviewed Mr. Gony, and searched his apartment. While officers were searching the apartment, two individuals arrived and attempted to enter the apartment: Tut Yual (Defendant) and a woman, Nyador Blim.[2] (TR. 14-16).

Special Agent Iten and another DEA agent, Andrew Hermes, stepped into the apartment hallway to speak to Defendant. Special Agent Iten testified this interaction in the hallway was "probably a couple short minutes," but it was not recorded because DEA agents are not issued body cameras. (TR. 28-29). Special Agent Iten observed Defendant had a speech impediment and had difficult conversing. Special Agent Iten told Defendant who they were and why they were there, and asked Defendant for his identification. Defendant replied his identification was in his car. Special Agent Iten testified he asked Defendant "if we could go get it," and Defendant replied, "Yes." (TR. 16-17). Special Agent Iten testified Defendant "did not have the option" to decline the request to provide his identification and to leave. (TR. 30-31).

Special Agents Iten and Hermes followed Defendant downstairs to his car, which was parked outside in the parking lot of the apartment complex. Special Agent Iten testified Defendant unlocked his car, opened the door, and attempted to reach into the center console to retrieve his identification, but Special Agent Iten stopped and "grabbed" him to prevent him from reaching into the console area due to "[o]fficer safety." Special Agent Iten testified that due to the nature

---

[1] Investigator Jaworski has been with the Nebraska State Patrol for approximately 23 years, with the last five to six years in the drug division. (TR. 39). Special Agent Iten has been with the DEA since 2019, and states his main duties are "to disrupt, dismantle, and destroy . . . international drug trafficking organizations." (TR. 11-12).

[2] Or possibly, Nyador "Blum," which is the spelling used in the government's brief. (Filing No. 69 at p. 2).

2

of narcotics investigations, as narcotics and firearms "go hand in hand," he did not "want an individual who I don't know, haven't identified yet, reaching into a place where historically guns have been found." Special Agent Iten testified that aside from it being a narcotics investigation, he did not have anything particularized to Defendant to make him believe he was armed or dangerous. (TR. 17-19, 30-32).

Special Agent Iten testified he "could smell the odor consistent with marijuana" as Defendant opened the car door to retrieve his identification. Special Agent Iten is familiar with the odor of marijuana, both burnt and unburnt, from his extensive experience. (TR. 19). Defendant was handcuffed and officers began searching Defendant's car. Special Agent Iten testified he retrieved Defendant's identification from the center console, and the only item of evidentiary value he found during the search were wire transfer receipts. (TR. 19-20). Special Agent Iten also testified that at some point during the course of the investigation, a "controlled call" was made from Mr. Gony's cell phone to see who he was talking to when he picked up the package containing narcotics. Defendant's cell phone rang during that time.[3] (TR. 23-24).

Investigator Jaworski and Special Agent Iten testified regarding portions of Exhibit 1, the audio-visual recording from Deputy Woodward's body worn camera that captured law enforcement's interaction with Defendant in the parking lot. The undersigned magistrate judge has also thoroughly reviewed Exhibit 1. (TR. 21-22, 40-47; Ex. 1).

Deputy Woodward's body camera began recording at 11:45:27 a.m. on December 6, 2022. Deputy Woodward approaches Defendant, who is handcuffed and standing with Investigator Jaworski and Special Agent Hermes outside Defendant's vehicle in the parking lot. At the time Deputy Woodward arrives, the front doors to Defendant's vehicle are open, and Special Agent Iten was already conducting his search. Deputy Woodward briefly summarizes what was relayed to him as he approaches, including stating there was the "plain odor of marijuana inside the vehicle." (TR. 22, 41; Ex. 1 at 11:45:27-53).

Investigator Jaworski explains to Defendant that the officers are conducting a narcotics investigation, that Defendant's "friend" has been "very cooperative," and that officers know this friend was on the phone with Defendant when that individual was picking up the package.

---

[3] The record does not reflect exactly when this "controlled call" was made; however, Investigator Jaworski advises Defendant at 11:46:05 a.m. that officers know Mr. Gony was on the phone with Defendant when Mr. Gony picked up the package. See Ex. 1.

Investigator Jaworski indicates they were searching Defendant's car based upon "them contacting you, after you came up to the door [of the apartment]" and "smelling the odor of marijuana coming from the vehicle." Investigator Jaworski tells Defendant he is "detained" but not under arrest, and provides a *Miranda* rights advisory. After the rights advisory, Defendant replies, "Yeah" when Investigator Jaworski asked if Defendant understands his rights, and shakes his head in the negative when Investigator Jaworski asks if Defendant has any questions. (Ex. 1 at 11:45:54-47:07).

Investigator Jaworski asks Defendant if he was willing to talk, and Defendant does not answer. Investigator Jaworski asks Defendant if he would answer some questions but not others, and Defendant indicated he would answer some questions. Investigator Jaworski then asked Defendant a series of questions, including why he was in town, whether he lived in Omaha, how long he had been in town, where he lived in town, whether he had a package shipped in town, and whether he had knowledge of the package. Investigator Jaworski also commented again that officers knew Defendant was on the phone with the individual when that individual was picking up the package. Defendant has a speech impediment of a significant stutter, which appeared to impact his ability to answer questions.[4] (Ex. 1 at 11:47:07-50:08). Investigator Jaworski then asks Defendant for his phone number; Defendant remains silent for several seconds before stating, "five," followed by more silence and then his statement, "I'm done talking, man," while turning his body and walking a couple steps away from Investigator Jaworski. (Ex. 1 at 11:50:08-29). Investigator Jaworski replied, "You're done talking? Okay. Alright," and walks away. (Ex. 1 at 11:50:29-38). Investigator Jaworski testified he went back upstairs to Mr. Gony's apartment. (TR. 41-42).

For the next approximately six minutes, Special Agent Iten continues searching Defendant's car from the passenger side, as Deputy Woodward and Special Agent Hermes stand with Defendant, who remains handcuffed and silent on the driver's side. At 11:56:35 a.m., Special Agent Iten enters the driver's side door and pulls out and begins looking at a paper receipt. At 11:57:05 a.m., an officer[5] approaches and tells Special Agents Iten and Hermes that they are going

---

[4] Special Agent Iten testified that Defendant appeared to understand what officers were saying to him, although officers admittedly had difficulty understanding Defendant due to his speech impediment. (TR. 26-27, 35). The undersigned magistrate judge similarly had difficulty understanding many of Defendant's recorded statements.

[5] Presumably this is Sergeant Tomas Meola of the Nebraska State Patrol, who was the supervisor on the scene, but the record is unclear as to which officer makes this statement. (TR. 22).

to "take everyone back to the DEA" and obtain a search warrant "for phones" to find who was tracking the package "and take that person to jail." (Ex. 1 at 11:57:05-17). Immediately after that statement, Special Agent Iten shows Defendant the receipt he recovered from Defendant's car and asks, "That you? Did you ship this?" Defendant looks at the receipt but does not say anything; Special Agent Iten then points to the receipt and says, "Do you know who that is?" Defendant shakes his head in the negative. Special Agent Iten states, "You didn't do this? [inaudible] send $1,400 dollars to California? Two days ago? Defendant begins shaking his head and says, "Two days ago?" Special Agent Iten replies, "Last month, last month, November. November 4th. That's not you? You didn't do that?" Defendant remains silent. (Ex. 1 at 11:57:17-48). Special Agent Iten acknowledges he was "showing" Defendant items found in the car and asking Defendant about them; Special Agent Iten testified he had not heard Defendant tell Investigator Jaworski he was "done talking" because Iten was searching inside the vehicle on the passenger side at the time. (TR. 32-34).

      Special Agent Iten reenters the driver's door of the car to continue searching. At 11:58:01 a.m., Sergeant Tomas Meola of the Nebraska State Patrol approaches and tells the officers they do not have enough marked units, so they are going to have to "take somebody and have a buddy follow you," referring to transporting the suspects to the DEA office. (TR. 22, 43-44). At 11:58:37 a.m., Special Agent Iten asks Defendant, "Did you ship something today?" Defendant starts shaking his head and begins to speak, stating something inaudible, but sounds to the undersigned magistrate judge like, "I, I, um . . . let them two go. . ." Special Agent Hermes says, "Wait, what?" Defendant begins speaking again, sounding to the undersigned magistrate judge like he is attempting to say, "let them," while gesturing his head in Deputy Woodward's direction before he appears to become frustrated and stops speaking. (Ex. 1 at 11:58:37-59:05). Investigator Jaworski testified that, outside of the camera's view, officers were bringing Mr. Gony and Ms. Blim down to the vehicles to be transported to the DEA office. (TR. 43).

      Investigator Jaworski returns to Defendant's vehicle at approximately 11:59:05 a.m. Special Agent Hermes tells Investigator Jaworski, "He was just saying something about, let those two go?" and asks Defendant what he said because "I really didn't hear you." Defendant does not speak for several seconds, and Special Agent Hermes again asks Defendant, "Did you want to repeat that," because he did not hear what Defendant said, and asks for "clarification." Investigator Jaworski then states, "Just so you know, right now everyone's going back. . . . everyone is a party

5

implicated in this . . . If you got something to say about it that's up to you." After a few seconds, Defendant says, "Let him and her go," and, "They don't know . . ." Investigator Jaworski states, "Earlier when we talked, I advised you of your rights, you just said you wanted to stop answering questions, you didn't ask for a lawyer, but you said you didn't want to answer questions, okay, and I understand that, but if you got something you want to tell me about them . . ." at which point Defendant interrupts to say something to the effect of, "[T]hey don't know," or "They don't have anything to do . . ." and, "I don't know [inaudible] but I'm supposed to pick up some package . . . They don't know anything . . ." Investigator Jaworski attempts to clarify, saying "Let me make sure I understand you, you're telling me that you were coming here to pick up a package?" Defendant replies, "a package." Investigator Jaworski asks, "And it was being shipped here." When Defendant did not immediately reply, Investigator Jaworski asks, "Do you want to answer these questions or not?" Defendant generally continues to make statements indicating "those two" do not know anything, that he "gave her a ride to the dental office," and to let them go. Defendant asks for water. While waiting for water, Sergeant Meola asks, "How many times have you done this? Packages?" Defendant does not reply, and is given a drink of water. (Ex. 1 at 11:59:05-12:03:18).

Sergeant Meola asks Defendant, "Hey, did you tell them you were coming over here to get a package? I don't want to bring someone to jail that shouldn't be going to jail. That's all." Defendant begins attempting to speak, and Sergeant Meola says, "Okay, I believe you, they don't know anything. But when you were talking to 'em did you say I'm on my way over to get a package?" Defendant nods his head and says, "Yeah." Sergeant Meola replies, "Yeah. Okay. Did [he] know what was in the package?" And Defendant replies, "He has no idea." Defendant also indicates he does not know what was in the package, but he was sent there to get it. Sergeant Meola walks across the parking lot to one of a police vehicle, and Defendant appears to ask Sergeant Meoloa again to let them go; Sergeant Meola says, "We're working on it. . . . Give us a minute," and Defendant says something inaudible, sounding like "no idea." After a few seconds, Defendant again says something to Sergeant Meola, who replies, "Just wait a second." Defendant mumbles something inaudible to himself. (Ex. 1 at 12:03:18-04:38).

At approximately 12:04:41 p.m. Special Agent Iten asked Defendant, "What were you supposed to do with the box after you got it?" and when Defendant did not answer, Special Agent Iten asked, "Who is it going to?" and comments that Defendant "can help yourself." Defendant

6

replied, "I don't know." Special Agent Iten says, "that's fine" and makes a couple more comments, including that they have "a lot of wire transfers," none of which Defendant responds to. Deputy Woodward and the other officers discuss transportation of the suspects and other logistics.

At 12:07:53 p.m., Investigator Jaworski approaches Defendant and says, "Here's where we're at, were you supposed to come here on Friday to pick up a package? No? . . . Someone coming Friday from Des Moines to pick up fentanyl." Meanwhile, Deputy Woodward is speaking to another officer about his vehicle, so the entirety of this conversation between Investigator Jaworski and Defendant is not recorded or audible. (Ex. 1 at 12:04:41-08:15). Investigator Jaworski asks Defendant, "Do you want to go back to the office and sit down so we're not outside to talk?" Defendant's response is inaudible, and Investigator Jaworski repeats the question. Defendant says something else inaudible, and Investigator Jaworski replies, "Well you're going to jail, or the office and then the jail, unless you can help us figure out where this package is supposed to go." Defendant says, "I don't know." Investigator Jaworski says, "Let's head to our office." Shortly after 12:10 p.m. Defendant was placed in a vehicle for transportation to the DEA office. (TR. 42-43; Ex. 1 at 12:08:15-10:50).[6]

Defendant was transported by Special Agent Zane Johnson to the DEA office for an interview. (Exhibit 2). Special Agent Iten and Special Agent Johnson, wearing plain clothes but with their firearms visible, were in the interview room with Defendant. Special Agent Iten verbally advised Defendant of his *Miranda* rights, and reminded Defendant that he was told these same rights earlier. Special Agent Iten told Defendant if there were some questions he was not comfortable answering, "like we were talking about out there," that is "fine" and to let them know. Defendant indicated he would answer "some" questions. Special Agent Iten gave Defendant a DEA 13 Rights Advisory Form, which Defendant signed. (TR. 25-26; Ex. 2 at 12:48:00-49:48). Special Agent Iten begins questioning Defendant about his earlier statement to "let them go." Special Agent Iten also asked Defendant why he was there that day. Defendant indicates he was there to pick up a package. Special Agent Iten generally attempts to ask Defendant about the package and who asked him to pick it up. Approximately five minutes after commencing the interview, at 12:53 p.m., Defendant indicates he is not comfortable talking, says he was "done,"

---

[6] The foregoing is not a complete, verbatim transcript of the conversation captured on Exhibit 1. Instead, the undersigned magistrate judge has only provided excerpts and portions of the exchanges with Defendant to the best of his ability.

7

and makes a statement about a lawyer. Special Agent Iten says "okay" and terminates the interview. (Ex. 2 at 12:49:58-53:45).

Defendant now moves to suppress evidence obtained from the warrantless search of his car and all statements he made after he stated he was "done talking." (Filing No. 53). As to the search, Defendant asserts he was not free to decline the order to produce his identification, which he had explained was in his car, and that Special Agent Iten's concern for "officer safety" when Defendant reached into his vehicle to obtain his identification was not supported by any particularized reasonable suspicion Defendant was armed or dangerous. Defendant further asserts Special Agent Iten's claim he smelled the odor of marijuana was "basically a manufactured situation so that they could get inside the vehicle," as no marijuana was found during the search. Even if officers did smell marijuana, Defendant argues there was "no reason the car could not have been closed and a warrant sought," citing *Chimel v. California*, 395 U.S. 752 (1969). (TR. 52-53; Filing No. 54 at p. 3).

Defendant also moves to suppress any statements he made after he invoked his right to remain silent when he told Investigator Jaworski he was "done talking." (Filing No. 54 at p. 4; Ex 1 at 11:50:37). Defendant asserts law enforcement did not "scrupulously honor" his invocation, and he did not "initiate" further conversation, but instead "submitted to the authority of law enforcement." Defendant asserts his purported "spontaneous" statement reinitiating questioning occurred within 20-seconds after Special Agent Iten asked, "Did you ship something here today," and was the result of unlawful continued questioning. Defendant also seeks to suppress any statements he made during his interrogation at the DEA office after being re-*Mirandized*, contending such statements again violated his earlier invocation of his right to remain silent. Defendant further argues all his statements were involuntarily made. (Filing No. 53 at p. 2; Filing No. 54 at pp. 5-6; TR. 6, 54, 62).

The Government contends the search was valid because Defendant "specifically gave consent to Special Agent Iten to enter his vehicle to get his identification," and that the subsequent odor of marijuana provided probable cause for a warrantless search under the automobile exception. (Filing No. 69 at p. 5). Regarding Defendant's statements, the Government identifies portions of Defendant's recorded statements in Exhibit 1 it does not intend to use:

- Any statements Defendant may have made from 11:46 through 11:50:32 when he said he's "done talking." (Filing No. 69 at p. 2).

8

- Any statements Defendant made in response to comments or questions from law enforcement from 11:57:22 to 11:58. (Filing No. 69 at pp. 2-3).

However, the Government does intend to use Defendant's statements from 11:58 to 12:05:20. The Government asserts Defendant started talking on his own after Sergeant Meola began directing the officers to take everyone into custody; Defendant stated something to the effect of, "let the others go," to which Investigator Jaworski stated, "Earlier you said you were done. Is there anything you want to say?" and permissibly began questioning Defendant again. (Filing No. 69 at pp. 3-4; TR. 61). The Government also intends to use Defendant's statements obtained from his interview at the DEA office after being re-advised of his *Miranda* rights. (Filing No. 69 at pp. 4-5).

## ANALYSIS

### I.   Search of the Vehicle

Defendant contends the warrantless search of his vehicle violated the Fourth Amendment, asserting both justifications offered by Special Agent Iten for entering Defendant's vehicle were either "manufactured" or unsupported. (TR. 52). Specifically, Defendant asserts he was not free to decline Special Agent Iten's order to produce his identification, which Defendant explained was inside his car; then despite knowing Defendant would have to reach inside his car to obtain his identification, "officers claimed to have to push him aside and grab the ID on his behalf for 'officer safety'" without any particularized reasonable suspicion Defendant was armed or dangerous. (Filing No. 54 at p. 3). Defendant further asserts Special Agent Iten's claim he smelled the odor of marijuana should not be taken at face value, but that even if he had smelled marijuana, there "was no reason the car could not have been closed and a warrant sought," citing the search incident to arrest exception to the warrant requirement under *Chimel*. (Filing No. 54 at p. 3).

The Government contends Defendant "specifically gave consent to Special Agent Iten to enter his vehicle to get his identification," (Filing No. 69 at p. 5), but the testimony adduced at the suppression hearing does not entirely support that contention. Special Agent Iten testified that he asked Defendant for his identification, which Defendant replied was in his car, and replied "Yes" when Special Agent Iten asked if "we could go down and get your identification." However, Special Agent Iten testified Defendant "did not have the option to get in his car and drive away and not [provide] his identification." Special Agent Iten testified he then "stopped" or "grabbed"

9

Defendant to prevent him from reaching into his car to retrieve his identification, due to his concern for officer safety. (TR. 18-19, 30-31, 37). Special Agent Iten's testimony reflects that the "request" for Defendant's identification was instead an order, and that Defendant did not "consent" to Special Agent Iten entering his vehicle, as Special Agent Iten physically prevented Defendant from reaching into his vehicle to retrieve his identification. (TR. 31). These circumstances instead suggest that rather than "consent," Defendant acquiesced to Special Agent Iten's authority. See *United States v. Welch*, 951 F.3d 901, 906 (8th Cir. 2020) (stating "[t]he government's burden [to establish voluntary consent] cannot be discharged by showing mere acquiescence to a claim of lawful authority") (internal quotation marks omitted); see also *United States v. DaCruz-Mendes*, 970 F.3d 904, 908 (8th Cir. 2020) (stating an encounter is only consensual "so long as a reasonable person would feel free to terminate the encounter or refuse to answer questions").

However, regardless of whether Defendant consented "to Special Agent Iten to enter his vehicle to get his identification," the undersigned magistrate judge finds there was reasonable suspicion to suspect Defendant was involved in criminal activity, and therefore the request to produce identification was permissible. At the time law enforcement officers first encountered Defendant, they were in the middle of a narcotics investigation involving the controlled delivery of a package containing over two thousand pills containing fentanyl. Officers had observed Mr. Gony pick up the package from the apartment complex office and return to an apartment; officers were actively searching that apartment and questioning Mr. Gony about the package when Defendant and another individual attempted to enter the apartment. Officers had observed Mr. Gony talking to someone on his cell phone when he picked up the package, and "controlled call" confirmed Mr. Gony was talking to Defendant at the time. "A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a brief investigative stop. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). These circumstances provided officers with reasonable suspicion to conduct an investigative stop of Defendant, during which they could permissible request he produce his identification. See *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (providing that an officer, in the course of a *Terry* stop, may ask a suspect for identification).

Defendant explained to Special Agent Iten that his identification was in his car, which was parked in the apartment complex parking lot. When Defendant opened his car to retrieve his identification, Special Agent Iten immediately smelled the odor of marijuana, which he is familiar with in his training and years of law enforcement experience, emanating from inside the vehicle. The Eighth Circuit has "repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception." *United States v. Milk*, 66 F.4th 1121, 1131 (8th Cir.), *cert. denied*, 144 S. Ct. 239 (2023); *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020) ("[T]he officers then had probable cause to search [the defendant's] vehicle because [the officer] smelled marijuana when [the defendant] opened the car door."). Aside from Special Agent Iten's stated concern for officer safety,[7] the odor of marijuana emanating from Defendant's vehicle, combined with the facts learned from their ongoing narcotics investigation, provided officers with probable cause to conduct the warrantless search. See *Milk*, 66 F4th at 1131.

Defendant essentially asks that the Court discredit Special Agent Iten's testimony that he smelled the odor of marijuana emanating from Defendant's vehicle, asserting this was a "manufactured" justification for the search. Defendant only points to the fact that no marijuana was recovered from Defendant's vehicle during the search as evidence this was a manufactured justification. (TR. 52).

Exhibit 1 reflects that officers on the scene commented on the odor of marijuana contemporaneously with their investigation. When Deputy Woodward's body camera began recording, he briefly states the developments in the investigation conveyed to him as he first approached Defendant outside his car, stating there was the "plain odor of marijuana inside the vehicle." Exhibit 1 also reflects that Investigator Jaworski told Defendant they were going to search his car due to the odor of marijuana. The recording of Defendant's interaction with officers does not reflect Defendant attempted to deny or dispute officers' statements that they smelled marijuana coming from his vehicle. There also is no evidence to suggest officers on the scene were making up their perception of the odor of marijuana to justify a search, and the fact that officers ultimately did not recover marijuana in the car does not negate their perception of the odor

---

[7] Which is not unfounded given that the Eighth Circuit has "repeatedly equated a person's suspected drug-deal involvement with a reasonable belief that the same person may be armed and dangerous." *Haynes v. Minnehan*, 14 F.4th 830, 836 (8th Cir. 2021) (citing *United States v. Johnson*, 528 F.3d 575, 579-80 (8th Cir. 2008)).

of marijuana emanating from the vehicle. "The assessment of a witness's credibility is the province of the trial court." *United States v. Mayfield*, 678 F. App'x 437, 439 (8th Cir. 2017) (quoting *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995). The undersigned magistrate judge finds Special Agent Iten's testimony on this issue to be credible. Therefore, officers had probable cause for the warrantless search, and did not violate Defendant's Fourth Amendment rights in doing so. See *Milk*, 66 F4th at 1131.

## II. Statements

### a. Defendant's statements contained in Exhibit 1

Defendant moves to suppress any statements he made after he told Investigator Jaworski he was "done talking." (Filing No. 54 at p. 4; Ex 1 at 11:50:37). As an initial matter, the Government does not intend to use any statements Defendant may have made from 11:46 through 11:50:32 when he said he's "done talking," nor any statements Defendant made in response to comments or questions from law enforcement from 11:57:22 to 11:58. (Filing No. 69 at pp. 2-3). This renders Defendant's motion to suppress moot as to use of those statements in the Government's case-in-chief. *United States v. Hill*, No. 8:23CR155, 2024 WL 1252265, at *8 (D. Neb. Mar. 25, 2024) ("[F]ederal courts have adopted a widespread procedural practice of denying motions to suppress as moot when the government agrees not to introduce the challenged statements at trial.").

Next, the parties do not appear to dispute that Defendant was "in custody" for purposes of *Miranda* when he was handcuffed and questioned by his vehicle. The undersigned magistrate judge will therefore assume for purposes of this motion that Defendant was subject to custodial interrogation. See *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966) (requiring *Miranda* warnings to be given when an individual is subjected to a "custodial interrogation"). Both parties also appear to agree that Defendant's statement to Investigator Jaworksi that he was "done talking" was an unequivocal invocation of his right to remain silent. See *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) ("A suspect invokes his right to remain silent by making 'a clear, consistent expression of a desire to remain silent.'").

"Once [*Miranda*] warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. "[A] person's 'right

12

to cut off questioning'" is central to the Fifth Amendment[.]" *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting *Miranda*, 384 U.S. at 474). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104. "In determining whether a defendant's right to silence is 'scrupulously honored,' [the] court considers three factors: 1) whether the initial interrogation ceased immediately upon the defendant's request; 2) whether a significant period had passed and fresh *Miranda* warnings were given before resuming questioning; and 3) whether the later interrogation is restricted to a crime that was not the subject of the first interrogation." *United States v. DeMarce*, 564 F.3d 989, 994 (8th Cir. 2009) (citing *Hatley v. Lockhart*, 990 F.2d 1070, 1073-74 (8th Cir. 1993).

Here, Investigator Jaworski terminated his questioning of Defendant immediately after Defendant stated he was "done talking." And, for approximately seven minutes, no further questions or comments were posed to Defendant, and Defendant remained silent. (Ex. 1 at 11:50:08-11:57:17). However, the record does not support the Government's assertion in its brief that, "No questions were posed to [Defendant] nor any statements made to him after he said "I'm done" until he started talking to the agents," (Filing No. 69 at p. 6), because at 11:57:17 a.m., Special Agent Iten began to ask Defendant several questions a reasonable officer would know were "reasonably likely to elicit an incriminating response." See *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005) ("Interrogation includes both direct questioning by officers and words or actions that officers should know are "'reasonably likely to elicit an incriminating response from the suspect.'") (citation omitted). Starting at approximately 11:57 a.m., immediately after Sergeant Meola says they are going to "take everyone back to the DEA" and obtain a search warrant "for phones" to find who was tracking the package "and take that person to jail," Special Agent Iten begins peppering Defendant with questions about the receipts he found in Defendant's car related to the package. Specifically, Special Agent Iten showed Defendant the wire transfer receipts from Defendant's car, and asked Defendant if he "shipped this," if he knew "who that is," and if he sent "$1,400 dollars to California." At 11:58:37 a.m., Special Agent Iten asks Defendant, "Did you ship something today?" Special Agent Iten admittedly did not hear Defendant tell Investigator Jaworski he was "done talking," and the Government appears to concede that this period of questioning was improper, as it does not intend to use any of Defendant's statements during this

13

period of time (not that Defendant said much). Such questioning of Defendant after he stated he was "done talking" did not "scrupulously honor" his invocation of his right to remain silent.

Because the Government does intend to use Defendant's statements from 11:58 a.m. to 12:05:20 p.m., the question then becomes whether Defendant's subsequent statements are admissible despite Special Agent Iten's approximately one-minute of questioning of Defendant after he invoked his right to remain silent. The Government maintains that Defendant made a spontaneous, voluntary statement to "let the others go" not in response to interrogation, and that law enforcement's attempt to clarify that statement led to Defendant's continued statements that did not demonstrate an unequivocal invocation of his *Miranda* rights. (Filing No. 69 at p. 6; TR. 61). Defendant counters that because law enforcement did not "scrupulously honor" his invocation of his right to remain silent, his subsequent statements were the product of Special Agent Iten's unlawful continued questioning. Defendant asserts his purported "spontaneous" statement reinitiating questioning occurred within 20-seconds after Special Agent Iten asked, "Did you ship something here today?" (Filing No. 54 at pp. 5-6; TR. 62).

Invoking the right to remain silent requires a "clear, consistent expression of a desire to remain silent." *United States v. Harris*, 64 F.4th 999, 1003 (8th Cir. 2023), *reh'g denied*, No. 22-1210, 2023 WL 3533498 (8th Cir. May 18, 2023). "*Miranda* does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996)). "Voluntary statements not in response to an interrogation . . . are admissible with or without *Miranda* warnings." *United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir.) *opinion amended* 611 F.3d 418 (8th Cir. 2010). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

After review of Exhibit 1 and the testimony adduced at the evidentiary hearing, the undersigned magistrate judge finds and concludes that Defendant's statement, "I, I, um . . . let them two go. . ." at 11:58 a.m. was a voluntary, spontaneous statement that was not made in response to interrogation, and that officers' attempts to clarify that statement permissibly led to

reinitiation of Defendant's questioning. As such, the undersigned magistrate judge finds Defendant's statements are admissible.

Although Defendant's statement to "let them two go" was preceded by Special Agent Iten's question, "Did you ship something today?" Defendant did not appear to be answering Special Agent Iten; instead, Defendant had his attention turned in the direction of the apartment building. Investigator Jaworski testified that, outside of the camera's view during this time, officers were bringing Mr. Gony and Ms. Blim down from the apartment to law enforcement's vehicles for transportation. Sergeant Meola had also just approached Deputy Woodward and Special Agent Hermes to tell them that they do not have enough marked units, so they are going to have to "take somebody and have a buddy follow you," referring to transporting the suspects—Defendant, Mr. Gony, and Ms. Blim—to the DEA office. Nor does Defendant's statement to "let them two go" make sense as an answer to the question Special Agent Iten asked about whether Defendant had shipped something today. When Special Agent Hermes says, "Wait, what?" Defendant attempted to speak again, sounding like he was trying to repeat his statement to "let them go," while gesturing his head in Deputy Woodward's direction towards the apartment complex. Therefore, the evidence supports a finding that Defendant's statement was not in response to interrogation, but instead was an uncoerced, spontaneous statement he made regarding Mr. Gony and Ms. Blim when he saw that they were being arrested.

The circumstances of this case are somewhat similar to the circumstances to those in *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004), a case cited by the Government. (Filing No. 69 at p. 6). In *Briones*, the defendant was waiting in the lobby of the police station after refusing to answer questions during a non-*Mirandized* police interview; when the defendant saw his girlfriend being led by police through the lobby he "blurted out" that she had nothing to do with the drugs because they were his. *Briones*, 390 F.3d at 611. The Eighth Circuit concluded the defendant's statement "was not the product of either express questioning or its functional equivalent" because "[n]o question was put to [the defendant] before he volunteered his remark, and he had just refused to answer questions during his interview[.]" Additionally, "[a]t the time [the defendant] blurted out his admission, [the police officer's] question had unambiguously ended" and "there is no indication that the officers anticipated that the sight of [his girlfriend] would cause [the defendant] to make an incriminating remark." As such, the Eighth Circuit found the defendant's statement was properly admitted. *Id.* at 612-13.

15

Unlike this case, however, the officers in *Briones* made no response to the defendant's spontaneous statement, but that distinction does not affect the outcome. See *id.* at 612. Here, in response to Defendant's statement, Special Agent Hermes says, "Wait, what?" When Investigator Jaworski returns to Defendant's vehicle moments later at approximately 11:59:05 a.m., Special Agent Hermes tells Investigator Jaworski, "He was just saying something about, let those two go?" and asks Defendant what he said because "I really didn't hear you." Special Agent Hermes asks Defendant if he wanted to repeat himself for "clarification." Special Agent Hermes' requests for clarification were permissible and did not constitute interrogation, and were also understandable given Defendant's speech impediment, which made his statements difficult to understand. See *Chipps*, 410 F.3d 438, 445 (citing *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989)) ("An officer's request for clarification of a spontaneous statement generally does not constitute interrogation."); see also, *United States v. Barnes*, 195 F.3d 1027, 1029 (8th Cir. 1999) (holding the defendant's statements were properly admitted, despite the defendant's invocation of his right to counsel, because the defendant made a spontaneous statement not made in response to interrogation, and the officer permissibly asked the defendant what he meant).

After Special Agent Hermes permissibly asked Defendant for clarification about his spontaneous statement, Defendant continued to make more statements generally indicating officers should "let him and her go" and that they "don't know [anything]." Investigator Jaworski reminded Defendant that he had advised him of his *Miranda* rights, and that Defendant had indicated he "didn't want to answer questions"; Defendant interrupted Investigator Jaworski to continue to make statements to the effect of, "[T]hey don't know," or "They don't have anything to do . . ." and "I don't know [inaudible] but I'm supposed to pick up some package." Investigator Jaworski attempted to clarify what Defendant was saying by stating, "Let me make sure I understand you, you're telling me that you were coming here to pick up a package?" Defendant replies, "a package." Investigator Jaworski asks, "And it was being shipped here." When Defendant did not immediately reply, Investigator Jaworski asked, "Do you want to answer these questions or not?" Defendant then continued to make incriminating statements. Defendant's statements and conduct demonstrate that to the extent he had invoked his right to remain silent when he said he was "done talking," he subsequently waived that right by reinitiating communication with law enforcement by making spontaneous, voluntary statements about the investigation. See *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) ("Waiver of the right

16

to remain silent 'can be clearly inferred from the actions and words of the person interrogated.'") (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); see also *Davis v. United States*, 512 U.S. 452, 458 (1994) (citation omitted) ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available *or the suspect himself reinitiates conversation*.").

Because Defendant reinitiated conversation with officers with his spontaneous statement at 11:58 a.m., and then continued to make statements and evidenced a willingness to talk despite his knowledge of his rights and earlier indication he was "done talking," Defendant's statements were not obtained in violation of his constitutional rights, and should not be suppressed.

### b. *Defendant's statements contained in Exhibit 2*

Defendant also seeks to suppress any statements he made during his interrogation at the DEA office contained in Exhibit 2. Defendant argues suppression is warranted because this interview violated his earlier invocation of his right to remain silent. (Filing No. 53 at p. 2; Filing No. 54 at pp. 5-6; TR. 62).

As discussed above, Defendant reinitiated conversation with law enforcement at 11:58 a.m. when he made his spontaneous statement to "let him and her go." Therefore, suppression of his DEA interview is unwarranted on the basis that it violated his earlier invocation of his right to remain silent. Moreover, prior to his DEA interview, Special Agent Iten readministered *Miranda* warnings to Defendant, and reminded Defendant that he was told these same rights earlier. Defendant indicated he would answer "some" questions and signed a DEA 13 Rights Advisory Form. Defendant knowingly waived his rights and spoke to Special Agent Iten for approximately five minutes, until Defendant indicated he was not comfortable talking, said he was "done," and makes a statement about a lawyer. Accordingly, Defendant's motion to suppress his statements during his DEA interview should be denied.

### c. *Voluntariness*

Defendant further contends all of his statements were coerced and involuntary. (Filing No. 53; TR. 6, 54, 62). Statements taken in violation of the prophylactic *Miranda* rules cannot be used as substantive evidence, but may still be admissible to impeach the conflicting testimony of a defendant. See *Oregon v. Hass*, 420 U.S. 714, 722-23 (1975); *Harris v. New York*, 401 U.S. 222,

17

224-26 (1971). It is only when the defendant's statements are involuntary that they must be excluded for all purposes. *New Jersey v. Portash*, 440 U.S. 450, 459 (1979); *Mincey v. Arizona*, 437 U.S. 385, 389 (1978).

Although the requirement that a *Miranda* warning be given does not dispense with the voluntariness inquiry, "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001) (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)). The central question in evaluating voluntariness "is whether the defendant's will was overborne." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); see also *United States v. Sandell*, 27 F.4th 625, 630 (8th Cir. 2022). To answer that question, the court examines "both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *United States v. Monteer*, 83 F.4th 1119, 1123 (8th Cir. 2023) (quoting *Sandell*, 27 F.4th at 630). "[T]he degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition" are all relevant factors. *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Magallon*, 984 F.3d at 1284 (quoting *LeBrun*, 363 F.3d at 724).

After review of both Exhibit 1 and Exhibit 2, the undersigned magistrate judge finds the totality of the circumstances do not suggest that Defendant's "will and capacity for self-determination" were overborne at any point during his interactions with law enforcement officers. *LeBrun*, 363 F.3d at 726 (calling this standard "very demanding"). Defendant was provided with a *Miranda* rights advisory both before Investigator Jaworski began his questioning in the apartment complex parking lot, and was provided a second *Miranda* rights advisory before his interrogation at the DEA office. Defendant clearly understood and comprehended his rights, and on more than one occasion felt comfortable telling officers he was done talking. The officers did no use any particularly coercive interrogation tactics, spoke to Defendant in conversational tones, did not brandish their weapons, and reminded Defendant he did not have to talk. Defendant is an adult male that appears to be of at least average intelligence, did not appear intoxicated, and appeared

to understand the questions posed to him. When Defendant asked for water, an officer quickly provided it to him. The entire recorded interaction with Defendant is barely over one hour, beginning at 11:45 a.m., and concluding at 12:53 p.m., and Defendant was not questioned for a significant portion of that time. Considering the totality of the circumstances, the undersigned magistrate judge finds Defendant's statements were voluntary, and at no point was his will overborne. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Brian C. Buescher, United States District Court Judge, that Defendant's Motion to Suppress Evidence (Filing No. 53) be denied.

Dated this 10th day of May, 2024.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.