IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>TUT YUAL,<br><br>                    Defendant. | **8:23–CR–9**<br><br>**MEMORANDUM AND ORDER ON OBJECTIONS TO FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS EVIDENCE AND STATEMENTS** |

The Government has charged the Defendant, Tut Yual, with one count of conspiracy to distribute and possess with intent to distribute 40 grams or more of a mixture or substance containing fentanyl in violation of 21 U.S.C. § 846. Filing 1 at 1. This charge arose after law enforcement intercepted a package containing approximately two and a half thousand M30 pills in December of 2022. Filing 108 at 11–13. During their investigation, Yual's vehicle was searched, and he made several statements to law enforcement. *See generally* Filing 103 (Exhibit 1 and Exhibit 2). Yual filed a Motion to Suppress Evidence and Statements in connection with this case. Filing 53; Filing 54. After the Government submitted its response opposing the bulk of the Motion, Filing 69, United States Magistrate Judge Michael D. Nelson held an evidentiary hearing. Filing 102 (Text Minute Entry); Filing 108. Judge Nelson later submitted a Findings and Recommendation to the undersigned, recommending that Yual's Motion be denied. Filing 109 at 19. This matter is now before the Court on Yual's Statement of Objections to the Findings and Recommendation. Filing 110. Having considered the foregoing, the Government's response (Filing 111), the record, and the governing law, the Court agrees with and adopts Judge Nelson's Findings and Recommendation. Accordingly, the objections Yual raises, Filing 110, are overruled, and his Motion to Dismiss, Filing 53, is denied.

1

## I.    BACKGROUND

Judge Nelson's Findings and Recommendation discusses the facts pertinent to Yual's Motion in greater detail. *See generally* Filing 109 at 1–9. The Court notes that although Yual objects to portions of the legal analysis and conclusions in the Findings and Recommendation, at no point does he claim that Judge Nelson incorrectly recited the facts in the Findings and Recommendation. *See e.g.*, Filing 110 at 3 (Yual contending, "This Court can easily come to quite a different legal conclusion, even if it accepts the factual findings of the magistrate"). This Court's local rules provide that the "[f]ailure to object to a finding of fact in a magistrate judge's recommendation may be construed as a waiver of the right to object from the district judge's order adopting the recommendation of the finding of fact." NECrimR 59.2(e). Given the lack of objection to any finding of fact contained in the Findings and Recommendation, coupled with the Court's own *de novo* review of the matter, the Court concludes that it is proper to adopt Judge Nelson's factual findings. *See* Filing 109 at 1–9. The following background information provides context for the Court's ruling on Yual's objections.

### 1.    *The Controlled Delivery*

On December 5, 2022, Investigator Nicholas Jaworksi with the Nebraska State Patrol and Special Agent Christian Iten with the United States Drug Enforcement Administration (DEA) were working with "Commercial Interdiction Units Task Force Group 2." Filing 108 at 12, 39. The objective of this task force is to "disrupt, dismantle, and destroy" international drug trafficking organizations. Filing 108 at 12. After the task force became aware of a suspicious package at the airport in Omaha, Nebraska, a search warrant was obtained and approximately two and a half thousand M30 pills containing fentanyl were found inside the package. Filing 108 at 12–13. The package was addressed to an individual named, "Deng Taath" at 10840 Cottonwood Lane in

Omaha, but the task force could not find any public records connecting an individual by that name to the address. Filing 108 at 13. The task force therefore decided that it would attempt a "controlled delivery" on December 6, 2022. Filing 108 at 13.[1] The drugs were taken out of the package, but the package was then delivered to the apartment manager's office while law enforcement conducted surveillance. Filing 108 at 14.

After the package was delivered to the apartment manager's office, an individual named Moses Gony arrived and picked it up. Filing 108 at 14. Mr. Gony was apprehended by members of the task force after he left the office, and they then proceeded to Mr. Gony's apartment and interviewed him. Filing 108 at 14–15. While agents were searching Mr. Gony's apartment, two individuals came to the door—one female and one male. Filing 108 at 15. They were later identified as Nyador Blim and Tut Yual. Filing 108 at 15. When these two individuals attempted to enter the apartment, Special Agent Iten and Special Agent Andrew Hermes "went out in the hallway and had a conversation with Mr. Yual." Filing 108 at 16. During their conversation, Special Agent Iten noticed that Yual had a speech impediment that caused them to have "difficulty conversing." Filing 108 at 17. Nevertheless, Special Agent Iten told Yual who they were, said why they were there, and asked Yual "for some identification." Filing 108 at 17. Yual told Special Agent Iten that his identification was in his car, so Special Agent Iten and Special Agent Hermes went downstairs with Yual to his vehicle. Filing 108 at 17. Special Agent Iten later said at the evidentiary hearing that Yual "did not have the option" to decline the request to provide his identification and to leave at that point in time. Filing 108 at 30–31.

---

[1] Special Agent Iten testified that a "controlled delivery is where the government seizes a package and attempts to deliver it as if it was going through the service -- as if we had not interdicted it -- in the attempts of finding the intended recipients of the package." Filing 108 at 13.

According to Special Agent Iten, when they arrived at the vehicle Yual unlocked it, opened the door, and attempted to reach into the car to retrieve his identification, but they "stopped him." Filing 108 at 18. When asked to explain why they "stopped him" at the evidentiary hearing, Special Agent Iten said that they did so for officer safety. Filing 108 at 19. He went on to explain, "We were dealing with a narcotics investigation. And a lot of times in narcotics investigation, firearms and narcotics go hand in hand. I don't want an individual who I don't know, haven't identified yet, reaching into a place where historically guns have been found." Filing 108 at 19. Special Agent Iten also testified that as Yual opened the door, his attention was drawn to an "odor consistent with marijuana." Filing 108 19. Special Agent Iten is familiar with this smell not only from his everyday experience living in Omaha, Nebraska, but also because "in [his] training and experience, [he has] dealt with over thousands of pounds of marijuana" and "know[s] the odor of both burnt and unburnt marijuana." Filing 108 at 19. Once Special Agent Iten smelled marijuana, they "detained Mr. Yual and began searching the vehicle." Filing 108 at 19. During the course of their search, law enforcement found Yual's identification in the center console of the vehicle. Filing 108 at 20. When Special Agent Iten was asked at the hearing, "What, if anything, of an evidentiary value did you find in the vehicle?" he responded, "I observed a bunch of wire transfer receipts. I believe that was it." Filing 108 at 20.[2]

### 2.  The Conversation with Yual Outside the Vehicle

Sometime after Yual was placed in handcuffs, another law enforcement officer—Deputy Andrew Woodward—turned on his body camera and began recording. Filing 108 at 22, 41. The footage from Deputy Woodward's body camera was introduced at the evidentiary hearing and

---

[2] At one point, law enforcement also made a "controlled call." Filing 108 at 24. Special Agent Iten testified that one of the officers called the number that Mr. Gony was talking to when he was picking up the package and Yual's phone rang at that time. Filing 108 at 24.

marked as Exhibit 1. Filing 103 (Exhibit 1); Filing 108 at 20–22. Exhibit 1 is approximately 25 minutes and 51 seconds in length. Filing 103 (Exhibit 1).

The body camera footage captured on Exhibit 1 begins at 11:45:27 a.m., with Deputy Woodward orally summarizing some of the previous events. Filing 103 (Exhibit 1). Specifically, Deputy Woodward notes that the officers performed a controlled delivery, a suspect gave consent to search the apartment, and that while they were performing the search "this party" (*i.e.*, Yual) arrived. Filing 103 (Exhibit 1). Deputy Woodward then says, "plain odor of marijuana inside the vehicle." Filing 103 (Exhibit 1). Deputy Woodward briefly peers inside the driver's side of the vehicle and Special Agent Iten can be seen looking through the contents of the vehicle. Filing 103 (Exhibit 1). After Special Agent Iten makes a brief remark about a "wire transfers account," Deputy Woodward turns his attention toward Investigator Jaworski who is speaking with Yual. Filing 103 (Exhibit 1). Judge Nelson's Findings and Recommendation accurately recounts the relevant moments that followed. *See generally* Filing 109 at 3–8. The Court repeats some of these findings here for context:

> Investigator Jaworski explains to Defendant that the officers are conducting a narcotics investigation, that Defendant's "friend" has been "very cooperative," and that officers know this friend was on the phone with Defendant when that individual was picking up the package. Investigator Jaworski indicates they were searching Defendant's car based upon "them contacting you, after you came up to the door [of the apartment]" and "smelling the odor of marijuana coming from the vehicle." Investigator Jaworski tells Defendant he is "detained" but not under arrest, and provides a *Miranda* rights advisory. After the rights advisory, Defendant replies, "Yeah" when Investigator Jaworski asked if Defendant understands his rights, and shakes his head in the negative when Investigator Jaworski asks if Defendant has any questions.

> Investigator Jaworski asks Defendant if he was willing to talk, and Defendant does not answer. Investigator Jaworski asks Defendant if he would answer some questions but not others, and Defendant indicated he would answer some questions. Investigator Jaworski then asked Defendant a series of questions, including why he was in town, whether he lived in Omaha, how long he had been in town, where he lived in town, whether he had a package shipped in town, and

whether he had knowledge of the package. Investigator Jaworski also commented again that officers knew Defendant was on the phone with the individual when that individual was picking up the package. Defendant has a speech impediment of a significant stutter, which appeared to impact his ability to answer questions. Investigator Jaworski then asks Defendant for his phone number; Defendant remains silent for several seconds before stating, "five," followed by more silence and then his statement, "I'm done talking, man," while turning his body and walking a couple steps away from Investigator Jaworski. Investigator Jaworski replied, "You're done talking? Okay. Alright," and walks away. Investigator Jaworski testified he went back upstairs to Mr. Gony's apartment.

For the next approximately six minutes, Special Agent Iten continues searching Defendant's car from the passenger side, as Deputy Woodward and Special Agent Hermes stand with Defendant, who remains handcuffed and silent on the driver's side. At 11:56:35 a.m., Special Agent Iten enters the driver's side door and pulls out and begins looking at a paper receipt. At 11:57:05 a.m., an officer approaches and tells Special Agents Iten and Hermes that they are going to "take everyone back to the DEA" and obtain a search warrant "for phones" to find who was tracking the package "and take that person to jail." Immediately after that statement, Special Agent Iten shows Defendant the receipt he recovered from Defendant's car and asks, "That you? Did you ship this?" Defendant looks at the receipt but does not say anything; Special Agent Iten then points to the receipt and says, "Do you know who that is?" Defendant shakes his head in the negative. Special Agent Iten states, "You didn't do this? [inaudible] send $1,400 dollars to California? Two days ago? Defendant begins shaking his head and says, "Two days ago?" Special Agent Iten replies, "Last month, last month, November. November 4th. That's not you? You didn't do that?" Defendant remains silent. Special Agent Iten acknowledges he was "showing" Defendant items found in the car and asking Defendant about them; Special Agent Iten testified he had not heard Defendant tell Investigator Jaworski he was "done talking" because Iten was searching inside the vehicle on the passenger side at the time.

Special Agent Iten reenters the driver's door of the car to continue searching. At 11:58:01 a.m., Sergeant Tomas Meola of the Nebraska State Patrol approaches and tells the officers they do not have enough marked units, so they are going to have to "take somebody and have a buddy follow you," referring to transporting the suspects to the DEA office. At 11:58:37 a.m., Special Agent Iten asks Defendant, "Did you ship something today?" Defendant starts shaking his head and begins to speak, stating something inaudible, but sounds to the undersigned magistrate judge like, "I, I, um . . . let them two go. . ."[3] Special Agent Hermes says, "Wait, what?" Defendant begins speaking again, sounding to the undersigned magistrate judge like he is attempting to say, "let them," while gesturing his head in Deputy Woodward's direction before he appears to become

---

[3] The Court agrees that this appears to be what Yual said.

frustrated and stops speaking.[4] Investigator Jaworski testified that, outside of the camera's view, officers were bringing Mr. Gony and Ms. Blim down to the vehicles to be transported to the DEA office.

Investigator Jaworski returns to Defendant's vehicle at approximately 11:59:05 a.m. Special Agent Hermes tells Investigator Jaworski, "He was just saying something about, let those two go?" and asks Defendant what he said because "I really didn't hear you." Defendant does not speak for several seconds, and Special Agent Hermes again asks Defendant, "Did you want to repeat that," because he did not hear what Defendant said, and asks for "clarification." Investigator Jaworski then states, "Just so you know, right now everyone's going back. . . . everyone is a party implicated in this . . . If you got something to say about it that's up to you." After a few seconds, Defendant says, "Let him and her go," and, "They don't know . . ." Investigator Jaworski states, "Earlier when we talked, I advised you of your rights, you just said you wanted to stop answering questions, you didn't ask for a lawyer, but you said you didn't want to answer questions, okay, and I understand that, but if you got something you want to tell me about them . . ." at which point Defendant interrupts to say something to the effect of, "[T]hey don't know," or "They don't have anything to do . . ." and, "I don't know [inaudible] but I'm supposed to pick up some package . . . They don't know anything . . . " Investigator Jaworski attempts to clarify, saying "Let me make sure I understand you, you're telling me that you were coming here to pick up a package?" Defendant replies, "a package." Investigator Jaworski asks, "And it was being shipped here." When Defendant did not immediately reply, Investigator Jaworski asks, "Do you want to answer these questions or not?" Defendant generally continues to make statements indicating "those two" do not know anything, that he "gave her a ride to the dental office," and to let them go. Defendant asks for water. While waiting for water, Sergeant Meola asks, "How many times have you done this? Packages?" Defendant does not reply, and is given a drink of water.

Sergeant Meola asks Defendant, "Hey, did you tell them you were coming over here to get a package? I don't want to bring someone to jail that shouldn't be going to jail. That's all." Defendant begins attempting to speak, and Sergeant Meola says, "Okay, I believe you, they don't know anything. But when you were talking to 'em did you say I'm on my way over to get a package?" Defendant nods his head and says, "Yeah." Sergeant Meola replies, "Yeah. Okay. Did [he] know what was in the package?" And Defendant replies, "He has no idea." Defendant also indicates he does not know what was in the package, but he was sent there to get it. Sergeant Meola walks across the parking lot to one of a police vehicle, and Defendant appears to ask Sergeant Meoloa again to let them go; Sergeant Meola says, "We're working on it. . . . Give us a minute," and Defendant says something inaudible, sounding like "no idea." After a few seconds, Defendant again says something to Sergeant Meola, who replies, "Just wait a second." Defendant mumbles something inaudible to himself.

---

[4] The Court again agrees that this appears to be what Yual said.

At approximately 12:04:41 p.m. Special Agent Iten asked Defendant, "What were you supposed to do with the box after you got it?" and when Defendant did not answer, Special Agent Iten asked, "Who is it going to?" and comments that Defendant "can help yourself." Defendant replied, "I don't know." Special Agent Iten says, "that's fine" and makes a couple more comments, including that they have "a lot of wire transfers," none of which Defendant responds to. Deputy Woodward and the other officers discuss transportation of the suspects and other logistics. At 12:07:53 p.m., Investigator Jaworski approaches Defendant and says, "Here's where we're at, were you supposed to come here on Friday to pick up a package? No? . . . Someone coming Friday from Des Moines to pick up fentanyl." Meanwhile, Deputy Woodward is speaking to another officer about his vehicle, so the entirety of this conversation between Investigator Jaworski and Defendant is not recorded or audible. Investigator Jaworski asks Defendant, "Do you want to go back to the office and sit down so we're not outside to talk?" Defendant's response is inaudible, and Investigator Jaworski repeats the question. Defendant says something else inaudible, and Investigator Jaworski replies, "Well you're going to jail, or the office and then the jail, unless you can help us figure out where this package is supposed to go." Defendant says, "I don't know." Investigator Jaworski says, "Let's head to our office." Shortly after 12:10 p.m. Defendant was placed in a vehicle for transportation to the DEA office.

Filing 109 at 3–7 (footnotes and citations to the record omitted).

### 3. The Conversation with Yual at the DEA Office

Yual was subsequently taken to a DEA office and placed in an interview room with recording capabilities. Filing 108 at 25. Special Agent Iten and Special Agent Zane Johnson joined Yual in this room, and their relatively brief interaction was recorded. Filing 108 at 25; Filing 103 (Exhibit 2).[5] During this interview, Yual was provided with water, and he was not secured in any restraints. Filing 103 (Exhibit 2). Special Agent Iten began the interview by informing Yual that he was going to advise Yual of the same rights he had been advised him of earlier. Filing 103 (Exhibit 2). After orally advising Yual of his *Miranda* rights, Special Agent Iten asked Yual whether he understood them, and then provided Yual with a written rights advisement form, gave Yual a pen, and asked Yual to indicate in writing whether he understood his rights. Filing 103

---

[5] Exhibit 2 is approximately six minutes in length.

8

(Exhibit 2). Special Agent Iten also told Yual that if there were some questions he was not comfortable answering, "like we were talking about out there," that is "fine" and to "let them know." Filing 103 (Exhibit 2). Special Agent Iten did all of this in a calm and cordial fashion. Filing 103 (Exhibit 2). Yual indicated that he understood his rights and was willing to answer "some" questions. Filing 103 (Exhibit 2).

After Yual completed the rights advisement form, Special Agent Iten asked Yual about his earlier statement to "let them go" and why he was there that day. Filing 103 (Exhibit 2). Yual responded by saying that he was there to pick up a package. Filing 103 (Exhibit 2). Special Agent Iten followed up with a question about who told him to pick up the package and Yual indicated that he did not wish to say anything further about that. Filing 103 (Exhibit 2). Special Agent Iten then asked Yual how he knew "to get that package there" and Yual indicated that he was not comfortable answering that question. Filing 103 (Exhibit 2). After some back and forth—much of which consisted of Special Agent Iten attempting to clarify what Yual was saying and what Yual was willing to talk about—Special Agent Iten asked Yual if his "job was just to get the package then and take it somewhere else[.]" Filing 103 (Exhibit 2). Yual nodded his head, suggesting an affirmative response. Filing 103 (Exhibit 2). Shortly thereafter, Yual indicated that he did not want to answer such questions and made a statement about a lawyer. Filing 103 (Exhibit 2). Special Agent Iten responded, "No problem," and the interview was terminated. Filing 103 (Exhibit 2).

## II.   ANALYSIS

### A.  Standard of Review

Under 28 U.S.C. § 636(b)(1), different standards of review apply when a party objects to a pretrial decision or a proposed findings of fact and recommendations by a magistrate judge. *See* 28 U.S.C. § 636(b)(1). When a party objects to a magistrate judge's proposed findings and recommendations, "[a] judge of the court shall make a de novo determination of those portions . .

9

. to which objection is made." *Id.*; *accord Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) (When a party timely objects to a magistrate judge's report and recommendation, the district court is required to make a de novo review of the record related to the objections . . . ."). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If desired, a reviewing district court judge may "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Under *de novo* review, a reviewing court "makes its own determinations of disputed issues and does not decide whether the magistrate[] [judge's] proposed findings are clearly erroneous." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). *De novo* review is non-deferential and requires an independent review of the entire matter. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When de novo review is compelled, no form of appellate deference is acceptable."); *United States v. Backer*, 362 F.3d 504, 508 (8th Cir. 2004) ("'De novo' is a Latin term literally meaning 'as new.' Our review is independent and not premised on the district court's appropriate use of its discretion. We are concerned only with the proper application of the law . . . ."). When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the Court has read the transcript of the suppression hearing and has reviewed the exhibits admitted at the hearing.

### B. Yual's Objections

Yual divides his statement of objections into three categories. Filing 110 at 2–5. First, he takes issue with the warrantless search of his vehicle. Filing 110 at 2–3. Next, he addresses statements he made after he told law enforcement that he was "done talking." Filing 110 at 4–5. Finally, he submits that "[t]he subsequent interrogation at the station should be suppressed." Filing 110 at 5. Under the Federal Rules of Criminal Procedure, this Court "must consider de novo any objections to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3). However, a party's failure to object in accordance with Rule 59 "waives a party's right to review." Fed. R. Crim. P. 59(b)(2); *United States v. Merrett*, 9 F.4th 713, 716 (8th Cir. 2021) (noting that the defendant "did not object to the magistrate judge's order denying his motion, and his failure to object waives his right to review under Federal Rule of Criminal Procedure 59(a)"), *cert. denied*, 142 S. Ct. 815 (2022); *see also United States v. Chen*, No. CR 21-250 (JRT/TNL), 2023 WL 1466503, at *3 (D. Minn. Feb. 2, 2023) (quoting *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015)). The Court will now address the three objections he raises.[6]

### 1. Yual's First Objection: The Warrantless Search of the Vehicle

Yual's first objection is directed at the warrantless search of his vehicle. Filing 110 at 2. He concedes that Judge Nelson's Findings and Recommendation, "correctly cites the law," Filing

---

[6] In Yual's Motion to Suppress, he asserted that his "statements were involuntarily given" and therefore "should also be suppressed as impeachment evidence at the time of trial." Filing 53 at 2. Judge Nelson concluded otherwise in his Findings and Recommendation. *See* Filing 109 at 17–19. The law draws a distinction between statements made in violation of *Miranda's* prophylactics and statements that are truly coerced or involuntary. *See New Jersey v. Portash*, 440 U.S. 450, 459 (1979) ("a defendant's compelled statements, as opposed to statements taken in violation of *Miranda*, may not be put to any testimonial use whatever against him in a criminal trial"). Although the word "voluntary" appears in Yual's Statement of Objections, Yual does not affirmatively contest Judge Nelson's conclusion that his statements were "voluntary" as that term is understood within this context. *See generally* Filing 110. Accordingly, Yual has waived this issue. *See* Fed. R. Crim. P. 59(b)(2). Even if this argument was not waived, the Court's *de novo* review of the matter leads it to alternatively conclude that Judge Nelson's analysis is correct, particularly given that the statements at issue were not "extracted by threats, violence, or express or implied promises to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)).

110 at 3, but argues that law enforcement effectively created a situation to get into his vehicle and that the lack of supporting evidence to corroborate Special Agent Iten's assertion that he smelled the odor of marijuana casts doubt on these officers' credibility. *See generally* Filing 110 at 2–4. Yual therefore asks that this Court "reject a finding that allows for law enforcement to manufacture situations designed exclusively to circumvent the warrant requirement." Filing 110 at 4. For its part, the Government submits that Yual's argument is "based on facts and evidence that do not exist, but unfounded assumptions he wants the court to make." Filing 111 at 1. The Court agrees with Judge Nelson that there was reasonable suspicion to detain Yual and request his identification for the reasons he explains in his Findings and Recommendation. Filing 109 at 10. The Court likewise agrees with Judge Nelson that probable cause existed to search the vehicle once Yual opened the door and law enforcement detected the odor of marijuana. Filing 109 at 12. Accordingly, Yual's first objection will be overruled.

The United States Court of Appeals for the Eighth Circuit has "repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception." *United States v. Milk*, 66 F.4th 1121, 1131 (8th Cir.) (internal quotations and citations omitted), *cert. denied*, 144 S. Ct. 239, 217 L. Ed. 2d 107 (2023). In his Findings and Recommendation, Judge Nelson concluded that "[a]side from Special Agent Iten's concern for officer safety, the odor of marijuana emanating from Defendant's vehicle, combined with the facts learned from their ongoing narcotics investigation, provided officers with probable cause to conduct the warrantless search." Filing 109 at 11 (footnote omitted). After having had the opportunity to personally observe his testimony, Judge Nelson specifically found "Special Agent's Iten's testimony on this issue to be credible." Filing 109 at 12. Yual disagrees, claiming that the officers knew "full well that all they need to say is that they smell an odor of marijuana to justify

12

a warrantless search" and noting that there was no marijuana in the car or on his person. Filing 110 at 3. Thus, in Yual's view, law enforcement manufactured a situation by having him retrieve his identification from his vehicle and then, once the door was opened, said they smelled the odor of marijuana to circumvent the warrant requirement. *See* Filing 110 at 4.

The Court agrees with Judge Nelson that Special Agent Iten's testimony on this front is credible. The Court reaches this conclusion after considering the matter *de novo*. *See United States v. Lothridge*, 324 F.3d 599, 601 (8th Cir. 2003) ("None of the case cited by the District Court stand for the proposition that a district judge can defer to a magistrate judge's findings on credibility"); *United States v. Mingo*, No. 18–CR–301 (NEB/DTS), 2020 WL 1527998, at *1 (D. Minn. Mar. 31, 2020) (noting that the magistrate judge found a law enforcement officer's testimony credible, but that because the defendant objected to this credibility determination, the court must review the matter *de novo* and draw its own conclusion as to the officer's credibility). The Court notes three matters which lend credibility to this testimony. First, Special Agent Iten testified under penalty of perjury and subject to cross-examination. Filing 108 at 10–11. His testimony about smelling marijuana remained consistent on both direct and cross-examination. Filing 108 at 19, 32. Second, Special Agent Iten was not just any law enforcement officer—he is employed with the DEA and is specifically assigned to an interdiction task force aimed at detecting and intercepting drugs. *See* Filing 108 at 11–12. Due to his training and experience as a Special Agent with the DEA, he has "dealt with over thousands of pounds of marijuana" and he "know[s] the odor of both burnt and unburnt marijuana." Filing 108 at 19. Third, although there is no video evidence capturing the moment when the vehicle was first opened and Special Agent Iten would have smelled the odor of marijuana, there is video evidence which corroborates Special Agent Iten's in-court testimony. As Judge Nelson correctly observed in his Findings and Recommendation,

> Exhibit 1 reflects that officers on the scene commented on the odor of marijuana contemporaneously with their investigation. When Deputy Woodward's body camera began recording, he briefly states the developments in the investigation conveyed to him as he first approached Defendant outside his car, stating there was the "plain odor of marijuana inside the vehicle." Exhibit 1 also reflects that Investigator Jaworski told Defendant they were going to search his car due to the odor of marijuana. The recording of Defendant's interaction with officers does not reflect Defendant attempted to deny or dispute officers' statements that they smelled marijuana coming from his vehicle.

Filing 109 at 11.

For these reasons, the Court concludes that Special Agent Iten's testimony that he smelled the odor of marijuana is credible. The Court rejects Yual's unsupported hypothesis that Special Agent Iten made this up as a pretext to get into the vehicle. The Court also rejects Yual's related assertion that the officers asked for his identification as a way to get access to his vehicle. The record shows that law enforcement asked Yual for his identification without knowing that it was in Yual's vehicle. *See* Filing 108 at 18; Filing 108 at 30–31. They only became aware of this because Yual told them his identification was in his vehicle. Filing 108 at 18 (Special Agent Iten testifying, "We asked him where his identification was. He said it was downstairs in his car."). This request for identification was valid—as were the officers' safety concerns when Yual reached into the vehicle—and there was probable cause to search the vehicle based on Special Agent Iten's credible testimony regarding the odor of marijuana. *See Milk*, 66 F.4th at 1131. As such, Yual's first objection is overruled.

### 2. *Yual's Second Objection*: *Statements Made After Yual Said He was Done Talking*

The second objection Yual raises takes issue with the admissibility of statements he made after expressing his intention to cease communicating with law enforcement. Filing 110 at 4–5. Specifically, Yual asks that the Court exclude all statements he made after telling law enforcement "I am done talking[.]" Filing 110 at 5. In his Findings and Recommendation, Judge Nelson

14

concluded that after Yual expressed his desire to stop speaking with Investigator Jaworski, "Special Agent Iten began to ask [Yual] several questions a reasonable officers would know were 'reasonably likely to elicit an incriminating response.'" Filing 109 at 13. *See United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) ("Interrogation in the Miranda context refers to express questioning and to words or conduct that officers should know is reasonably likely to elicit an incriminating response from the suspect.") (internal quotations and citation omitted). However, because the Government has said that it will not introduce any evidence related to this questioning during its case in chief, that matter is moot. *See United States v. Hill*, No. 8:23CR155, 2024 WL 1252265, at *8 (D. Neb. Mar. 25, 2024) (citing cases for the proposition that "federal courts have adopted a widespread procedural practice of denying motions to suppress as moot when the government agrees not to introduce the challenged statements at trial").

Thus, as Judge Nelson put it, "the question then becomes whether Defendant's subsequent statements are admissible despite Special Agent Iten's approximately one-minute of questioning of Defendant after he invoked his right to remain silent." Filing 109 at 14. Judge Nelson reasoned that based upon his "review of Exhibit 1 and the testimony adduced at the evidentiary hearing . . . [Yual's] statement, 'I, I, um . . . let them two go . . .' at 11:58 a.m. was a voluntary, spontaneous statement that was not made in response to interrogation, and that officers' attempts to clarify that statement permissibly led to reinitiation of [Yual's] questioning." Filing 109 at 14. Therefore, because Yual "reinitiated conversation with officers with his spontaneous statement at 11:58 a.m., and then continued to make statements and evidenced a willingness to talk despite his knowledge of his rights and earlier indication he was 'done talking,'" Judge Nelson concluded that Yual's "statements were not obtained in violation of his constitutional rights, and should not be suppressed." Filing 109 at 17.

Yual objects to this analysis, claiming that it "fail[s] to recognize that [he] was in a police-dominated situation where he was questioned unlawfully." Filing 110 at 5. Yual admits that, "in a vacuum" his statements "may appear spontaneous or voluntary" but posits that when appropriate consideration is given to the surrounding circumstances, such statements were in reality "the product of a situation that commenced with unlawful questioning initiated by law enforcement." Filing 110 at 5. Yual therefore asks that the Court "exclude all the statements made after, [he said] 'I am done talking[.]'" Filing 110 at 5. While Yual disagrees with Judge Nelson's ultimate conclusion, he does contest or attempt to distinguish any of the authority Judge Nelson cites in his Findings and Recommendation. *See* Filing 110 at 4–5. Nor does Yual cite a case or point to any other source of authority that he claims supports his position.  *See* Filing 110 at 4–5.

Having considered the matter *de novo*, the Court agrees with Judge Nelson's analysis and conclusion. "When a defendant invokes his right to remain silent, officers must scrupulously honor that right." *United States v. Kelly*, 329 F.3d 624, 629 (8th Cir. 2003). Although Special Agent Iten may not have heard Yual tell Investigator Jaworski that he was "done talking," by asking Yual questions about the receipts he found in the vehicle, Yual's invocation of his right to remain silent was not scrupulously honored. The Government claims not to concede error, Filing 69 at 11, but nevertheless represents that it "does not intend to use any statements Yual may have made in response to any comments or questions from law enforcement from 11:57:22 to 11:58." Filing 69 at 3.[7] Given that these statements are not in dispute and this matter is mooted, the Court agrees that the real question at issue is whether Yual's subsequent statements captured on Exhibit 1 that were made after 11:58 a.m. may be admitted.

---

[7] At the suppression hearing, Counsel for the Government said, "Agent Iten didn't know that Mr. Yual had said he didn't want to talk which is why I conceded in my brief that any of those question -- frankly there were no answers, but any of those questions shouldn't even be brought up and that the government will not present that in its case in chief." Filing 108 at 61.

The Court agrees with Judge Nelson's analysis and conclusion that these statements made after 11:58 a.m. should not be suppressed because Yual made "a voluntary, spontaneous statement that was not made in response to interrogation, and that officers' attempts to clarify that statement permissibly led to reinitiation of [Yual's] questioning." Filing 109 at 14–15. The last thing Special Agent Iten asked Yual before that was whether he had shipped anything that day. Filing 103 (Exhibit 1). Yual did not respond to that question. Instead, and without any prompting, he spontaneously told law enforcement "let them two go." Filing 103 (Exhibit 1). Thus, this statement was not responsive to anything law enforcement had asked him. Filing 103 (Exhibit 1). Filing 103 (Exhibit 1). As Investigator Jaworski later explained during his testimony, when Yual made this statement, other officers were "bringing Mr. Gony and Ms. Blim down to vehicles to be transported to the DEA office." Filing 108 at 43. There was "no indication that officers anticipated that the sight of [them] would cause [Yual] to make an incriminating remark[,]" *Briones*, 390 F.3d at 612, but that would explain why Yual chose to make this spontaneous statement at that time, and why this statement had nothing to do with what Special Agent Iten had said to him.

The officers' attempt to get clarification as to what Yual had just said did not constitute interrogation. *See United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) ("An officer's request for clarification of a spontaneous statement generally does not constitute interrogation"). Moreover, the need for clarification was all the more imperative here given Yual's accent and very significant speech impediment. When Investigator Jaworski arrived back at the scene, he even reminded Yual that he had advised Yual of his rights when they spoke previously and that Yual expressed he did not want to answer questions at that time. Filing 103 (Exhibit 1). Investigator Jaworski then began to tell Yual that if there was something he wanted to tell law enforcement about "them" (*i.e.*, Ms. Blim and Mr. Gony), but before Investigator Jaworski could finish Yual

interrupted him and made statements suggesting that Mr. Blim and Mr. Gony were not implicated in the matter. Filing 103 (Exhibit 1). Without further prompting, Yual then proceeded to say that he was supposed to pick up a package. Filing 103 (Exhibit 1). As Investigator Jaworski sought clarification as to what he just heard, he once again asked Yual if he "wanted to answer these questions or not" and Yual continued to make statements. Filing 103 (Exhibit 1). Accordingly, the Court agrees with Judge Nelson that Yual's "statements and conduct demonstrate that to the extent he had invoked his right to remain silent when he said he was 'done talking,' he subsequently waived that right by reinitiating communication with law enforcement by making spontaneous, voluntary statements about the investigation." Filing 109 at 16. On this basis, Yual's second objection is overruled.

### 3.   *Yual's Third Objection*: *Subsequent Statements Yual Made at the DEA Office*

Yual's third and final objection relates to whether subsequent statements he made at the DEA office should be suppressed. Filing 110 at 5. This third objection is an extension of his second because Yual does not point to any other invocation of his right to remain silent apart from his prior comment about being "done talking" that he made while standing outside his vehicle and before he arrived at the DEA office. *See* Filing 54 at 5–6; Filing 110 at 5. Prior to being questioned at the DEA office, Yual was again advised of his *Miranda* rights. Filing 103 (Exhibit 2). However, he argues that under the circumstances present in his case, "a successive *Miranda* warning was ineffective in advising [him] that he had any real choice about giving an additional statement." Filing 110 at 5.

The Court disagrees. As explained above, and as Judge Nelson likewise recognized, Yual reinitiated conversation with law enforcement by making a spontaneous statement and, therefore, "suppression of his DEA interview is unwarranted on the basis that it violated his earlier invocation

of his right to remain silent." Filing 109 at 17. Moreover, Yual's assertion that the "successive *Miranda* warning was ineffective in advising [him] that he had any real choice about giving an additional statement" is directly belied by the fact that Yual indicated to Special Agent Iten that he was willing to answer "some" of his questions. *See* Filing 103 (Exhibit 2). Indeed, within five minutes and thirty seconds, Yual made a statement indicating that he wanted a lawyer and that he was done talking, thereby terminating the interview. *See* Filing 103 (Exhibit 2).[8] The record demonstrates that Yual not only understood he had a "real choice," but that he chose to exercise this "real choice" shortly after the interview began. Accordingly, his third objection is overruled.

### III.   CONCLUSION

For the foregoing reasons, and upon *de novo* review, the Court agrees with the findings and conclusions reached by Judge Nelson. Yual's objections lack merit, and all other issues that have not been raised by Yual are waived. *See* Fed. R. Crim. P. 59(b). Accordingly,

IT IS ORDERED:

1. Yual's Statement of Objections, Filing 110, is overruled;

2. Judge Nelson's Findings and Recommendation, Filing 109, is adopted; and

3. Yual's Motion to Suppress, Filing 53, is denied.

Dated this 24th day of June, 2024.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge

---

[8] While it somewhat difficult to decipher exactly what Yual said given the poor audio quality of the recording, it was apparently quite clear to Special Agent Iten that Yual was invoking his rights because the interview was terminated at that point. *See* Filing 103 (Exhibit 2).